UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| NICOLE ANN LONG, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> CAROLYN W. COLVIN, ) <br> Acting Commissioner of the Social ) <br> Security Administration, ) <br> ) <br> Defendant. ) <br> ) <br> ) | Case No. EDCV 13-1461 AJW <br><br> MEMORANDUM OF DECISION |

Plaintiff filed this action seeking reversal of the decision of defendant, the Commissioner of the Social Security Administration (the "Commissioner"), denying plaintiff's application for supplemental security income ("SSI") benefits. The parties have filed a Joint Stipulation ("JS") setting forth their contentions with respect to each disputed issue.

**Administrative Proceedings**

The procedural facts summarized in the joint stipulation are undisputed. [See JS 2-3]. In a written hearing decision that constitutes the Commissioner's final decision in this matter, an administrative law judge (the "ALJ") found that plaintiff had severe impairments consisting of morbid obesity, anterolisthesis of L5 on S1, and degenerative disc disease, but that she retained the residual functional capacity ("RFC") to perform a reduced range of sedentary work. [AR 24-33]. The ALJ concluded that the plaintiff was unable to perform her past relevant work as a general clerk, which is a light, semi-skilled occupation. [AR

33]. Based on the testimony of a vocational expert, the ALJ determined that plaintiff could perform alternate jobs that exist in significant numbers in the national economy, such as a food and beverage order clerk, optical assembler, and buttons and notions assembler. [AR 33-34]. Therefore, the ALJ found plaintiff not disabled at any time through the date of his decision. [AR 35].

## Standard of Review

The Commissioner's denial of benefits should be disturbed only if it is not supported by substantial evidence or is based on legal error. Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1054 (9th Cir. 2006); Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002). "Substantial evidence" means "more than a mere scintilla, but less than a preponderance." Bayliss v. Barnhart, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005). "It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) (internal quotation marks omitted). The court is required to review the record as a whole and to consider evidence detracting from the decision as well as evidence supporting the decision. Robbins v. Soc. Sec. Admin, 466 F.3d 880, 882 (9th Cir. 2006); Verduzco v. Apfel, 188 F.3d 1087, 1089 (9th Cir. 1999). "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." Thomas, 278 F.3d at 954 (citing Morgan v. Comm'r, Soc. Sec. Admin., 169 F.3d 595, 599 (9th Cir. 1999)).

## Discussion

**Severity finding**

Plaintiff contends that the ALJ erred in finding that her fibromyalgia was not a severe impairment. [JS 4-7, 9-10].

A medically determinable impairment or combination of impairments is not severe if the evidence establishes "a slight abnormality that has no more than a minimal effect on an individual's ability to work." Webb v. Barnhart, 433 F.3d 683, 686 (9th Cir. 2006) (quoting Smolen v. Chater, 80 F.3d 1273, 1289-1290 (9th Cir. 1996)). To assess severity, the ALJ must determine whether a claimant's impairment or combination of impairments significantly limits his or her physical or mental ability to do "basic work activities." 20 C.F.R. §§ 404.1521(a), 416.921(a); see Webb, 433 F.3d at 686. Basic work activities are the "abilities and aptitudes necessary to do most jobs," such as (1) physical functions like walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, and handling; (2) the capacity for seeing, hearing,

speaking, understanding, carrying out, and remembering simple instructions; (3) the use of judgment; and (4) the ability to respond appropriately to supervision, co-workers, and usual work situations. 20 C.F.R. §§ 404.1521(b), 416.921(b). The ALJ is required to consider the claimant's subjective symptoms in making a severity determination if the claimant "first establishes by objective medical evidence (i.e., signs and laboratory findings) that he or she has a medically determinable physical or mental impairment(s) and that the impairment(s) could reasonably be expected to produce the alleged symptom(s)." Social Security Ruling ("SSR") 96-3p, 1996 WL 374181, at *2.

The ALJ found that there was objective evidence in the record showing that plaintiff had been evaluated and treated for fibromyalgia, hypertension, menometrorrhagia, and Epstein-Barr virus, which was equated by a treating source to chronic fatigue syndrome. [AR 24]. The ALJ found that those conditions were being managed medically, and that no aggressive treatment was recommended or anticipated for them. [AR 24]. Accordingly, although the ALJ found they were medically determinable medical impairments, he found they were nonsevere because they were only slight abnormalities and did not have more than a minimal effect on plaintiff's ability to do basic physical and mental work activities. [AR 24].

Plaintiff poses no specific challenge to the ALJ's finding, except to say that the treatment she received revolved around her chronic pain and chronic fatigue. She suggests that because she was diagnosed with fibromylagia, and because that impairment shares a number of common features with chronic fatigue syndrome, the ALJ erred in not finding her fibromyalgia severe. [JS 6].

However, the mere fact that plaintiff received a diagnosis of fibromyalgia does not mean that it is either severe or disabling. See Sample v. Schweiker, 694 F.2d 639, 642-643 (9th Cir. 1982) (noting that the existence of a diagnosed disorder "is not per se disabling," so "there must be proof of the impairment's disabling severity"); Hinkle v. Apfel, 132 F.3d 1349, 1352 (10th Cir. 1997) (stating that a claimant "must show more than the mere presence of a condition or ailment" at step two) (citing Bowen v. Yuckert, 482 U.S. 137, 153 (1987)); Higgs v. Bowen, 880 F.2d 860, 863 (6th Cir. 1988) (explaining that "[t]he mere diagnosis of [an impairment], of course, says nothing about the severity of the condition," and holding that the Appeals Council did not err in finding a claimant's diagnosed arthritis not severe where "the doctors' reports are silent regarding any limitation of joint motion, as well as the intensity, frequency, and duration of arthritic pain"); Jefferson v. Colvin, 2014 WL 4275516 at *8 (E.D. Cal. Aug. 29, 2014) (concluding that

the claimant's diagnosis of fibromyalgia was insufficient by itself to establish that it was a severe impairment).

Moreover, the ALJ concluded that plaintiff's diagnosis of fibromyalgia was "questionable." [AR 30]. The ALJ explained that fibromyalgia is medically determinable if there are signs, primarily tender points, that are clinically established by the medical record. [AR 30]. The ALJ explained that the American College of Rheumatology ("ACR") defines the disorder as "widespread pain in all four quadrants of the body for a minimum duration of 3 months and at least 11 of the 18 specified tender points that cluster around the neck and shoulder, chest, hip, knee, and elbow regions." [AR 30]. The ALJ noted that other symptoms, may be signs of fibromyalgia if they have been clinically documented over time, such as irritable bowel syndrome, chronic headaches, temporomandibular joint dysfunction, sleep disorder, severe fatigue, and cognitive dysfunction. [AR 30].

The ALJ noted that an August 27, 2010 treatment note from LaSalle Medical Associates ("LaSalle") indicated plaintiff was "positive for 18 trigger points," reflecting a "possible" fibromyalgia diagnosis. [AR 30, 267, 305]. Although the ALJ gave plaintiff "the benefit of the doubt in finding that fibromyalgia is a medically determinable impairment," the ALJ also remarked that the record lacked sufficient positive clinical or diagnostic findings to satisfy the ACR criteria for fibromyalgia. [AR 30]. For example, periodic physical examinations revealed no positive findings of pain in areas other than the claimant's back. [AR 30, 309-310, 313-314, 320-321, 323-324; see also AR 270]. The August 27, 2010 note was the only report in the record indicating that plaintiff exhibited positive fibromyalgia trigger points. [AR 267] While subsequent notes from LaSalle included an "impression" of fibromyalgia, none of those notes show the number of trigger or tender points identified or otherwise document the requisite clinical or diagnostic findings.

In her reply, plaintiff challenges the ALJ's findings that no aggressive treatment was recommended or anticipated for her fibromyalgia, and that the condition would be amenable to control. [JS 9-10]. However, plaintiff points to nothing in the record contravening the ALJ's findings. A medically-determinable impairment that is controlled with medication or treatment may properly be considered non-severe. See Kassebaum v. Comm'r of Soc. Sec., 420 Fed. App'x 769, 772 (9th Cir. 2011) (holding that the ALJ did not err in finding that carpal tunnel syndrome was not a severe impairment because surgery had

1  been successful, "at least as much as necessary to ensure that the ailment was not so severe as to interfere
2  significantly with [claimant's] ability to work"). The record shows that plaintiff has taken a variety of
3  medications to control her condition, including Vicodin[1], Motrin[2] and Soma.[3]  [AR 45]. Her condition
4  appears to have responded to this medication because her treating physician consistently recommended that
5  she continue "regular meds." [AR 223-224, 266, 268-269, 277, 286, 292-293, 300, 304, 309-310, 314, 318-
6  320]. While plaintiff complained at times that the medication did not help, treatment records reveal that she
7  sometimes forgot to take her medication and also that she sometimes asked for more conservative treatment,
8  such as ibuprofen. [See AR 214, 222, 294, 302]. See Pruitt v. Astrue, 2012 WL 2006150, at *2 (C.D. Cal.
9  June 5, 2012) (citing cases holding that Motrin (ibuprofen) is conservative treatment); Avilez v. Colvin,
10  2013 WL 1628612, at *5 (characterizing the use of ibuprofen, Darvocet, and Soma as conservative
11  treatment) (C.D. Cal. Apr. 15, 2013). Moreover, as the ALJ noted, surgical intervention had never been
12  required, and plaintiff had not even been referred to a specialist. [AR 29]. In fact, plaintiff's treating doctor
13  specifically recommended against surgery, and advised plaintiff to lose weight, walk, and exercise instead.
14  [AR 218, 276, 282, 298, 300, 319]. Treatment notes also suggest that plaintiff did not want a more
15  aggressive form of treatment, such as surgery.[4] [AR 265, 308]. Accordingly, the ALJ did not err in finding

---

[1] Vicodin is the brand name for a combination of hydrocodone, an opioid pain medicine, with the analgesic acetaminophen, and is used for the relief of moderate to moderately severe pain. See United States National Library of Medicine, PubMed Health website, at http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0010590/?report=details (last accessed Sept. 29, 2014).

[2] Motrin is a brand of ibuprofen, which is a nonsteroidal anti-inflamatory drug used to treat "mild to moderate" pain. See United States National Library of Medicine, PubMed Health website, at http:www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0010648/ (last accessed Sept. 29, 2014).

[3] Soma (carisoprodol) is a muscle relaxant that is used to relieve pain and discomfort caused by strains, sprains, and other muscle injuries. See United States National Library of Medicine and National Institutes of Health, MedlinePlus website, available at http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682578.html (last accessed Sept. 29, 2014).

[4] In his October 2, 2010 orthopedic consultative examination report Dr. Zaven Bilezikjian stated that surgery had been recommended at one point, but he does not indicate when this recommendation was made or for what condition, and there is nothing in the record showing that surgery was performed. [AR 239]. In any event, Dr. Bilezikjian said plaintiff had refused surgery, which is consistent with the treatment record. [AR 239, 265, 308].

that plaintiff's fibromyalgia was not a severe impairment. See de Pulido v. Comm'r of Soc. Sec., 2012 WL 253327, at *9 (E.D. Cal. Jan. 25, 2012) (holding that the ALJ did not err in finding fibromyalgia non-severe).

**Credibility finding**

Plaintiff contends that the ALJ improperly assessed her subjective symptom testimony. [JS 10-14, 16-17].

Plaintiff was represented by counsel during the administrative hearing in April 2012 and testified on her own behalf. [AR 43-61]. She is single and lives with her 16-year-old son, her mother, and her brother. [AR 44, 47-48.] Her son has chronic asthma, and he received social security benefits based on that condition. [AR 47]. Her brother was born disabled. [AR 48]. Her mother, who receives unemployment benefits, takes care of plaintiff's brother. [AR 48].

Plaintiff completed about a year of college including enough units to become a pre-school teacher. [AR 44]. She worked as a clerical worker at a center for children with disabilities in 1999 and 2000. [AR 45]. She was employed a few nights a week filing, answering phones, closing the center, and performing other clerical work. [AR 45]. She worked as a pre-school teacher in 2000 and 2001 "[o]ff and on for a few years at different pre-schools." [AR 47]. She also worked around 2003 as a daycare recruiting assistant doing paperwork and visiting people who needed assistance with bathing and other things. [AR 45-46].

Plaintiff started having back problems 13 years ago. [AR 47]. At first, doctors said it was just a vertebrae that had slipped out of place, but as it got worse they discovered it was "arthritis and stuff." [AR 47-48]. She has been taking Vicodin daily for five or six years. [AR 45]. She also takes Motrin and Soma, and explained that although Soma "can mess up my back" the doctors want her to take it at night "to help me to sleep with the pain in my back." [AR 45]. She said she takes the medication even though "it doesn't do anything really." [AR 50]. Asked by the ALJ if her doctor told her there was anything they could do about her back, she answered that right now she is just taking medication and is "waiting to go back to pain management to see if there's anything else they can recommend." [AR 49].

Plaintiff testified that she takes Cymbalta for her fibromyalgia, a condition she describes as causing "chronic pain all the time." [AR 50]. She said her doctor increased her Cymbalta dosage to two a day, but added that it "doesn't make a difference and so I take pain medication but it doesn't really do much good."

6

[AR 50-51]. Plaintiff said her other problems are chronic fatigue, Epstein-Barr syndrome, insomnia, and hypertension. [AR 51]. Her hypertension is under control with medication, but the Epstein-Barr virus causes her pain and insomnia. [AR 51-52].

Plaintiff experiences pain and muscle spasms in her back. [AR 53]. She gets muscle spasms if she stands for more than five minutes. [AR 53, 55]. When she performs tasks with her hands, they may cramp up and go numb. [AR 54]. Plaintiff said that she can sit for 30 to 45 minutes and then has to stand for a few minutes. [AR 54]. Lying down and stretching her back two or three times a day helps with the pain. [AR 54-55]. She can lift two pounds. [AR 55].

Plaintiff explained that if she has errands to do, on some days she will "just get up and do them," but when the pain is really bad she postpones errands. [AR 48]. She tries to cook daily, but her son cooks if she is having a bad day. [AR 48]. She tries to clean daily, depending on how she feels. [AR 48, 56]. She does laundry, reads, and plays card and board games. [AR 48-49, 57]. She can go to the store and pick up her medication on her own. [AR 56]. She takes her son to and from school, but he does not go every day because he is "on an independent study." [AR 56]. She shops for groceries using a cart. [AR 56]. She does not have any problems bathing or getting dressed. [AR 57]. She drives a car, but her feet "cramp" about half the time when she drives. [AR 58]. She does not do yard work anymore. [AR 59].

Once a disability claimant produces evidence of an underlying physical or mental impairment that is reasonably likely to be the source of his or her subjective symptoms, the adjudicator is required to consider all subjective testimony as to the severity of the symptoms. Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir. 2004); Bunnell v. Sullivan, 947 F.2d 341, 345 (9th Cir. 1991) (en banc); see also 20 C.F.R. §§ 404.1529(a), 416.929(a) (explaining how pain and other symptoms are evaluated). Although the ALJ may then disregard the subjective testimony he considers not credible, he must provide specific, convincing reasons for doing so. Tonapetyan v. Halter, 242 F.3d 1144, 1148 (9th Cir. 2001); see also Moisa, 367 F.3d at 885 (stating that in the absence of evidence of malingering, an ALJ may not dismiss the subjective testimony of claimant without providing "clear and convincing reasons"). The ALJ's credibility findings "must be sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit the claimant's testimony." Moisa, 367 F.3d at 885; see Light v. Soc. Sec. Admin., 119 F.3d 789, 792 (9th Cir. 1997) (enumerating factors that bear

on the credibility of subjective complaints); Fair v. Bowen, 885 F.2d 597, 604 n.5 (9th Cir. 1989) (same). If the ALJ's assessment of the claimant's testimony is reasonable and is supported by substantial evidence, it is not the court's role to "second-guess" it. Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001).

The ALJ concluded that plaintiff's answers to questions regarding her pain level indicated that she was exaggerating the severity of her symptoms "for secondary gain." [AR 28]. During the hearing, the ALJ asked plaintiff to rate her pain on a scale of zero to 10. [AR 49]. Plaintiff answered "10." [AR 49]. The ALJ replied, "[a] 10?," and then explained that "when we say 0 to 10[,] a 10 is like you want to jump out a window because you can't stand the pain. You're in agony, you're almost screaming." [AR 49]. Plaintiff followed by qualifying her answer as "[m]aybe about a seven on a daily basis." [AR 49].

Plaintiff contends that the ALJ improperly discredited her on the basis of her answers to those questions. [JS 12]. That contention has merit. Plaintiff revised her pain rating after the ALJ explained what a "10" rating meant to him. Her answers do not suggest that she was trying to exaggerate the extent of her pain. See, e.g., Fair, 885 F.2d at 601-602 (noting that a subjective pain "ranking . . . is of only marginal assistance to a decisionmaker whose own subjective one-to-ten scale may differ significantly").

An ALJ's reliance on an erroneous reason in making an adverse credibility determination is harmless "[s]o long as there remains substantial evidence supporting the ALJ's conclusions on credibility and the error does not negate the validity of the ALJ's ultimate credibility conclusion . . . ." Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1162 (9th Cir. 2008) (internal quotation marks, ellipsis, and alteration omitted). The relevant inquiry "is not whether the ALJ would have made a different decision absent any error," but "whether the ALJ's decision remains legally valid, despite such error." Carmickle, 533 F.3d at 1162.

The ALJ's decision remains legally valid despite his error because he articulated additional particularized, clear, and convincing reasons for rejecting the alleged severity of plaintiff's subjective complaints. Specifically, the ALJ noticed that plaintiff "betrayed no evidence of pain or discomfort while testifying at the hearing until [she] was asked to describe the pain she experienced." [AR 28]. Plaintiff contends that it was improper for the ALJ to rely on his observations of her during the hearing. [JS 12]. Although generally not entitled to great weight, "[t]he inclusion of the ALJ's personal observations does not render the decision improper." Morgan, 169 F.3d at 600; see SSR 96-7p, 1996 WL 374186, at *5 ("In

8

1 instances where the individual attends an administrative proceeding conducted by the adjudicator, the
2 adjudicator may also consider his or her own recorded observations of the individual as part of the overall
3 evaluation of the credibility of the individual's statements."). The ALJ tempered his reliance on his
4 observations by noting the hearing's short length and assigning his observations slight weight.

The ALJ also relied on plaintiff's inconsistent statements about why she stopped working. [JS 12]. The ALJ noted that plaintiff told the consultative psychiatric examiner, Dr. Andia, that she had stopped working as a preschool teacher due to excessive menstrual bleeding in 2005, but that plaintiff told the orthopedic consultative examiner Dr. Bilezikjian, that she stopped working as a preschool teacher in 2004 or 2005 because she was laid off. [AR 28, 232-233, 239-240]. Both statements are inconsistent with plaintiff's representations on her SSI application and disability reports that she became disabled on July 30, 2003. [See AR 28, 118, 132]. The ALJ properly relied on these inconsistent statements in assessing plaintiff's credibility. See Bruton v. Massanari, 268 F.3d 824, 828 (9th Cir. 2001) (holding that the ALJ did not err in discrediting the claimant's subjective complaints where the claimant "stated at the administrative hearing and to at least one of his doctors that he left his job because he was laid off, rather than because he was injured").

Finally, plaintiff challenges the ALJ's reliance on her daily activities. [JS 12-13, 17]. The ALJ noted that plaintiff stated in her disability reports and testimony that, on a typical day, depending on her pain, she played cards and board games [AR 48-49, 57, 168, 172]; ran errands when needed [AR 48, 168, 171, 233]; took her son to and from school (albeit not every day) [AR 56]; went grocery shopping regularly [AR 56]; spent one to one-and-a-half hours preparing meals on a daily basis [AR 48, 168, 170-71, 233]; did light housework, including washing dishes, ironing clothes, cleaning, laundry [AR 48, 168-170, 233]; drove a car [AR 163, 166, 233, 255]; ate out monthly [AR 172, 233]; visited her sister weekly [AR 172]; sent text messages daily [AR 171, 174]; read, swam, listened to music, and watched television [AR 168, 172, 233]; and cared for her adolescent son, including helping him with his homework [AR 29, 168-169, 233]. The ALJ also noted that plaintiff denied any problems with personal hygiene or personal care [AR 29, 56, 169, 233, 254]. The ALJ concluded that some of the physical and mental abilities and social interactions required to perform these activities are the same as those necessary for performing sedentary work. [AR 29]. The ALJ reasonably inferred that plaintiff's admitted ability to perform a fairly wide range of routine daily

activities independently and without reporting significant interference or ill-effects from her allegedly disabling symptoms was one factor, among others, that justified rejecting the alleged severity of her subjective symptoms. See Molina v. Astrue, 674 F.3d 1104, 1113 (9th Cir. 2012) (noting that even when a claimant's daily activities "suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment"); Valentine v. Comm'r, Soc. Sec. Admin., 574 F.3d 685, 693 (9th Cir. 2009) (holding that the ALJ permissibly concluded that while the claimant's activities did not show that he could return to his past job, they suggested a higher level of functioning than had been portrayed in the claimant's subjective testimony); Burch, 400 F.3d at 679 (holding that the ALJ did not err in finding that the claimant's ability to care for her own personal needs, cook, clean, shop, interact with family, and manage her finances suggested that the claimant "was quite functional" and undermined her credibility). [AR 28, 232-233].

Because plaintiff fails to discuss, or even acknowledge, the ALJ's remaining reasons for finding her not credible, she has waived any challenge to these remaining aspects of the ALJ's credibility finding. See Greger v. Barnhart, 464 F.3d 968, 973 (9th Cir. 2006) (holding that claimant waived issues because he did not raise those issues before the district court); Bergfeld v. Barnhart, 361 F. Supp. 2d 1102, 1110 (D. Ariz. 2005) ("A reviewing federal court will only address the issues raised by the claimant in his appeal from the ALJ's decision.").

The ALJ was entitled to consider the other inconsistencies addressed in the decision. For example, the ALJ noted plaintiff's testimony that her medication "doesn't do anything really." [AR 28, 50]. The ALJ concluded that this was an "apparent exaggeration" because "[i]t is a reasonable conclusion that, despite her assertion to the contrary, the medication helped with her pain to some extent or else she would not have continued taking the medication." [AR 28]. This was a sensible inference from the record. Moreover, although plaintiff at times complained that her medication did not do anything, she also continued to seek and use it. [AR 218, 223-224, 266, 292-293, 298, 306, 320]. The ALJ could properly discount the believability of her testimony that the medication did not help considering she continued to ask for and use the medication. See, e.g., Tonapetyan, 242 F.3d at 1148 (explaining that the ALJ may use "ordinary techniques of credibility evaluation"); Callardo v. Astrue, 2008 WL 4183985, at *10 (E.D. Cal. Sept. 10, 2008) (holding that credibility determination was supported by the record partly because the claimant asked

for a refill of her medication while at the same time maintaining that her medication was not working).

The ALJ also permissibly considered plaintiff's statements to physicians that she continued to work as a preschool teacher until 2004 or 2005, after her alleged onset of disability. [See AR 29, 233, 239]. See 20 C.F.R. §§ 416.929(a)&(c)(3) (stating that the Commissioner will consider a claimant's efforts to work and prior work record in evaluating symptoms); SSR 96-7p, 1996 WL 374186, at *5 (stating that adjudicator may consider a claimant's statements and reports regarding the claimant's prior work record and efforts to work).

The ALJ found that plaintiff's credibility was further diminished because the alleged severity of her symptoms was inconsistent with her treatment history, in that plaintiff received "routine conservative treatment." [AR 29]. As discussed above, the fact that more aggressive treatment was not required, including surgical intervention or even a referral to a specialist, was inconsistent with plaintiff's allegations of a disabling condition. [AR 29]. During the hearing plaintiff testified that she was simply taking her medication and waiting to see if anything else could be recommended.[5] [AR 49]. Accordingly, plaintiff's treatment history provided another legitimate basis for rejecting the alleged severity of her subjective complaints. See Meanel v. Apfel, 172 F.3d 1111, 1114 (9th Cir. 1999) (explaining that the ALJ properly considered, as part of his credibility evaluation, the treating physician's failure to prescribe, and the claimant's failure to request, medical treatment commensurate with the "supposedly excruciating" pain alleged).

For the foregoing reasons, the ALJ's error in relying on the first factor did "not negate the validity of [his] ultimate credibility conclusion" and therefore was harmless. Carmickle, 533 F.3d at 1162.

**Lay witness testimony**

Plaintiff contends that the ALJ erred in rejecting a third-party function report written by plaintiff's mother. [JS 17-18, 20-21].

While an ALJ must take into account lay witness testimony about a claimant's symptoms, the ALJ may discount that testimony by providing "reasons that are germane to each witness." Greger, 464 F.3d

---

[5] During the hearing plaintiff said that she thought she had received a cortisone shot in the emergency room, but there is no medical evidence in the record documenting such treatment. [AR 46; see AR 189].

at 972 (quoting <u>Dodrill v. Shalala</u>, 12 F.3d 915, 919 (9th Cir. 1993)). Germane reasons for rejecting a lay witness's testimony include inconsistencies between that testimony and the medical evidence, inconsistencies between that testimony and the claimant's presentation to treating physicians during the period at issue, the claimant's failure to participate in prescribed treatment, and the possibility that the lay witness was "influenced by [a] desire to help" the claimant due to their "close relationship." <u>Greger</u>, 464 F.3d at 972; see <u>Bayliss</u>, 427 F.3d at 1218; <u>Lewis v. Apfel</u>, 236 F.3d 503, 511 (9th Cir. 2001).

The ALJ noted that plaintiff's mother's statements mostly duplicated the subjective complaints reported by plaintiff. [AR 33]. The ALJ noted that, in fact, plaintiff's mother's statements appeared to be an almost verbatim recitation of the allegations from plaintiff's own function report.[6] [AR 33]. The ALJ concluded that plaintiff's mother's statements were credible to the extent they were consistent with an RFC for sedentary work. [AR 33]. The ALJ permissibly rejected her statements suggesting more severe limitations as they were not supported by clinical or diagnostic medical evidence, one of the reasons he also relied upon in the severity finding and to reject plaintiff's subjective testimony. [AR 30, 33]. Accordingly, there was no error in the ALJ's rejection of plaintiff's mother's statement. See <u>Valentine</u>, 574 F.3d at 693-694 ("In light of our conclusion that the ALJ provided clear and convincing reasons for rejecting [the claimant's] own subjective complaints, and because [his wife's] testimony was similar to such complaints, it follows that the ALJ also gave germane reasons for rejecting her testimony."); <u>Lewis</u>, 236 F.3d at 511 ("One reason for which an ALJ may discount lay testimony is that it conflicts with medical evidence.").

Further, the ALJ noted that plaintiff's mother was not unbiased because she had a maternal and financial interest in ensuring that plaintiff received benefits in order to increase the household income. [AR 33]. Standing alone, a claimant's financial motivation for obtaining benefits is not a valid reason for discrediting the testimony of the claimant or family members. See <u>Ratto v. Sec'y, Dep't of Health & Human Servs.</u>, 839 F. Supp. 1415, 1428-1429 (D. Or. 1993) ("If the desire or expectation of obtaining benefits were by itself sufficient to discredit a claimant's testimony, then no claimant (or their spouse, or friends, or family) would ever be found credible."). However, an ALJ does not have to ignore the possibility that

---

[6] The statements also appear to be written in the same handwriting. [<u>Compare</u> AR 160-167 <u>with</u> AR 168-174].

financial concerns or a "close relationship" with the claimant influenced a lay witness's testimony. See Greger, 464 F.3d at 972; Gaddis v. Chater, 76 F.3d 893, 896 (8th Cir. 1996) (agreeing with the ALJ that there was a "strong element of secondary gain in this case," and that the claimant's conduct "belies his sincere belief that he is truly disabled"). As the pointed out, plaintiff lived with her mother, who was not working and was receiving unemployment compensation, and her brother, who is disabled. [AR 29]. The ALJ permissibly considered plaintiff's mother's financial and familial interest in helping her daughter obtain benefits, along with other factors, in evaluating the credibility of her statements.

**Vocational expert testimony**

Plaintiff contends that the ALJ improperly relied on the vocational expert's testimony because it is inconsistent with sedentary work and the Dictionary of Occupational Titles ("DOT"). [JS 21-25].

A claimant is "not disabled" if she retains the residual functional capacity to perform the "actual functional demands and job duties of a particular past relevant job" or the "functional demands and job duties of the occupation as generally required by employers throughout the national economy." Pinto v. Massanari, 249 F.3d 840, 845 (9th Cir. 2001) (quoting SSR 82-62); see also Burch, 400 F.3d at 679; Villa v. Heckler, 797 F.2d 794, 798 (9th Cir. 1986) ("The claimant has the burden of proving an inability to return to [her] former type of work and not just to [her] former job."). Information in the DOT, or the testimony of a vocational specialist, may be used to ascertain the demands of an occupation as ordinarily required by employers throughout the national economy. SSR 82-61, 1982 WL 31387, at *2; Villa, 797 F.2d at 798; cf. Maier v. Comm'r of the Social Sec. Admin., 154 F.3d 913, 915 (9th Cir. 1998) (per curiam) (holding that the ALJ properly relied on expert testimony to deviate from the DOT job classification at step five). Regardless of which source of job information is used, the ALJ is required to make "specific findings as to the claimant's residual functional capacity, the physical and mental demands of the past relevant work, and the relation of the residual functional capacity to the past work." Pinto, 249 F.3d at 845 (citing SSR 82-62).

Plaintiff appears to contend that the RFC is inconsistent with the DOT because the full range of sedentary work entails sitting during most or all of an eight hour day. [JS 22]. Plaintiff misconstrues the ALJ's RFC finding, however. The ALJ did not find that plaintiff was able to work a full range of sedentary jobs. Rather, the ALJ found that plaintiff could perform a reduced range of sedentary work, in that she can lift and/or carry 10 pounds occasionally and 10 pounds frequently; she can stand and/or

walk for two hours out of an eight-hour workday in 15 minute intervals; she can sit for six hours out of an eight-hour workday with regular breaks, but must stand every half hour for one minute before sitting back down; she cannot push and/or pull with the legs; she must avoid unprotected heights; she must avoid extreme cold; she must avoid climbing ladders but can occasionally climb stairs or ramps; she can occasionally stoop or bend; and she can occasionally perform overhead lifting.

[AR 26].

During the hearing, the vocational expert testified that a hypothetical person with plaintiff's vocational profile and the RFC ultimately adopted by the ALJ could perform alternate jobs that exist in significant numbers in the national economy, such as order clerk, food and beverage, DOT occupational classification number 209.567-014; optical assembler, DOT occupational classification number 713.687-018; and assembler, buttons and notions, DOT occupational classification number 734.687-018. [AR 62]. The ALJ specifically asked the vocational expert whether her testimony was consistent with the DOT, and she said that it was. [AR 62]. The ALJ relied on this testimony in finding plaintiff not disabled. [AR 33-34].

Plaintiff cites no authority demonstrating that the vocational expert's testimony is inconsistent with the three DOT jobs she identified. The DOT describes each of these occupations as sedentary work, which "involves sitting most of the time, but may involve walking or standing for brief periods of time." See DOT, 209.567-014, 1991 WL 671794; DOT, 713.687-018, 1991 WL 679271; DOT, 734.687-018, 1991 WL 679950. The ALJ found that plaintiff could sit for six hours in an eight-hour workday [AR 25], and plaintiff has pointed to no authority suggesting that the need to stand for one minute every half hour is inconsistent with the three DOT jobs identified by the vocational expert. Accordingly, the ALJ did not err in relying on the vocational expert's testimony.

## Conclusion

For the reasons stated above, the Commissioner's decision is **affirmed**.

**IT IS SO ORDERED.**

December 23, 2014

_____
ANDREW J. WISTRICH
United States Magistrate Judge